## TANNER v. CHILDERS.

No. 6791.   Decided July 16, 1945.   (160 P. 2d 965.)

See 37 C. J. S. Frauds, Statute of, sec. 148; Pro rata distribution by seller to buyers; note, 74 A. L. R. 995. See, also, 46 Am. Jur., 421.

*Delbert M. Draper,* of Salt Lake City, for appellant.

*Jensen & Jensen,* of Ephraim, for respondent.

McDONOUGH, Justice.

Appeal from a judgment on a verdict in favor of plaintiff for damages for alleged breach of contract to deliver 9000 turkey poults allegedly purchased by plaintiff. Appellant attacks the verdict and judgment principally on two grounds: (1) That the evidence was not sufficient to warrant submission of the case to the jury. (2) That the court admitted incompetent evidence, including testimony of plaintiff as to the meaning of certain phrases in a written instrument.

By his pleadings plaintiff alleged that there was a contract made on or about November 10, 1942, whereby defendant through her agent, Clinton L. Black, agreed to deliver 9000 turkey poults for 75 cents per poult, between March 10 and April 25, 1943; that in April, 1943, plaintiff received about 4000 poults, and on June 11, 1943, some 750 poults; that the latter were accepted under an express agreement that defendant would forthwith deliver a balance of 4250 on or before July 2, 1943, but that defendant failed and neglected to do so to the damage of the plaintiff in the sum of $4500 less $65 as the unpaid balance of purchase price of poults previously delivered.

Defendant, by her answer, denied that she entered into any agreement to deliver 9000 turkey poults by a certain date or at all. She alleged that plaintiff placed two orders, one of which was filled after plaintiff forwarded a deposit on April 3, 1943, and that as to the other order, defendant on June 11, 1943, tendered to plaintiff 6800 poults and advised him that no more would be available; that the plaintiff requested defendant to fill the orders of certain designated persons first and to deliver the balance of the birds to him; that said deliveries were in full satisfaction of the orders

as far as turkeys were available for delivery; and that the plaintiff then owed a balance of $65 which he had failed and neglected to pay. Defendant further alleged that if there was any oral contract to deliver 4250 turkeys on or before July 2, 1943, the same was void under the statute of frauds, the amount of the purchase price being in excess of $500.

Defendant operates a hatchery at Santa Ana, California. For a number of years she has sold turkey poults to turkey growers in Utah, including plaintiff, as well as the growers in other states. In operating her hatcheries, defendant received eggs from blood-tested stock, the number of eggs obtained always depending upon a combination of events and conditions: weather, light (which affects egg production and the period of egg production), and the number of hens available at any time during the breeding season which could meet the blood-test standards. Fertility of eggs could not be successfully forecast, so that the number of eggs produced would not be a fair index to the number of hatched poults. In 1942 and 1943 there were blackouts along the Pacific coast by governmental orders, which precluded the use of artificial light which was essential to early and normal egg production. There was also a period of damp, cold weather which also resulted in a decline in egg production from the tested stock. Defendant depended exclusively on the blood-tested stock for her source of eggs for her hatchery from which she filled her orders.

During the period mentioned, Clinton L. Black was the representative of defendant who took orders for day-old turkey poults in the state of Utah. On September 10, 1942, plaintiff informed Black that he wanted to get all of his poultry from defendant's hatchery. Plaintiff was informed that the breeding stock was not in shape to warrant receiving any orders at that time. On November 10, 1942, plaintiff signed two separate orders, one for 4000 and the other for 5000 day-old turkey poults, for delivery about March 10th and April 25th, respectively. The form of the order in each case is identical except as to number and date of delivery requested. The first of the two orders is as follows:

"TO CHILDERS HATCHERY

P. O. Box 1793                                    Santa Ana, Calif.
Order No. ———————————          Date     11-10     , 1942

Name     Ray Tanner

Street or R. F. D. ——————————————————
Town   . Provo     State     Utah

How Ship     Truck     When   Mar. 1 to 10th

All orders taken subject to prior sale or hazards beyond our control.
Broad-Breasted turkeys do not always reproduce 100% true to type.

| No. | Breed-Grade | Price | Amount |
|-----|-------------|-------|--------|
| 4000 | B. B. Poults | .75 | 3000.00 |

                              Signed     Ray S. Tanner

We guarantee 100% live delivery of baby poults.
Right is reserved to make delivery of this order within five days of
the date booked."

At the time the foregoing order was signed Black told
plaintiff that "he thought that the hens would start laying
early enough" to enable plaintiff to receive the poults some
time in March. During the following February, Black in-
formed plaintiff that the first order would arrive late.
Thereafter in the latter part of March, plaintiff telephoned
to the defendant and asked why the first order had not been
delivered. Defendant stated that she was late in getting
eggs, but she assured plaintiff that he would be the next
person to whom turkeys would be shipped; that she was
catching up on orders and that she expected the second order
to be filled about the time it was supposed to be filled. On
April 6th and 9th poults were delivered to plaintiff sub-
stantially sufficient to fill the first order. Plaintiff made
no objection to this late delivery but thereafter he fre-
quently inquired of Black as to when the additional poults
could be expected and complained about delay in delivery.
Some days prior to the deliveries in April, the plaintiff
sent a check for $1000 to the defendant. Two thousand five
hundred dollars additional was paid by the plaintiff on

April 9th. This constituted the balance of payment on the first order plus an advance payment of $500 on the second order. At the time of such payment, Black explained the causes for delay to the plaintiff and informed him that he could not state definitely when more poults could be shipped.

About June 1st Black notified plaintiff that the next shipment into Utah would fall considerably short of filling all of the remaining orders in this area. On June 11th about 7300 turkey poults arrived by truck. They were not consigned to any one but were accompanied by Black. The latter told plaintiff that no more poults would be available and asked plaintiff what he should do. In substance, the plaintiff directed Black to fill all orders of other customers first and then give him the balance. Black did as plaintiff directed. As a consequence, plaintiff received only 768 poults instead of 3500, which he would have received had he permitted the orders to be filled pro rata. Plaintiff testified that on receiving these poults, he insisted that the balance of the order be filled. After application of the $500 credit toward payment for the poults thus delivered, plaintiff owed a balance of $65. It appears from plaintiff's testimony that subsequent to this last delivery he had an argument with Black over payment of the balance and that he telephoned to the defendant in California and demanded delivery of the balance of the 5000 order. According to his testimony the defendant at the time of that conversation promised him she would deliver them by July 2, 1943.

On July 15th, some three or four days following this telephone conversation plaintiff sent the following letter to defendant:

"Last Saturday evening in telephone conversation with you, Mrs. Childers, you promised to have delivery of 4200 number one broad breasted bronze turkeys at my ranch in Indianola, Sanpete County, Utah not later than July 2, 1943. The day before your representative, C. L. Black, refused to fill the orders. These are the balance of the orders of myself, Geo. N. Day, and Lee C. Mower; and which were promised to be delivered during the first half of April, 1943.

"I ask that on or before the 20th inst. you get either a letter or wire to me that you will deliver said number and kind of turkeys at

my ranch on or before the 2nd day of July, 1943. Your failure to so do, will make it necessary for me to buy these birds here and at a figure above that at which you agreed to deliver them. Because of the lateness of the time of year, it is imperative that I have final word of whether you are going to keep, or breach this contract.

"In the event I do not hear from you by the 20th inst. it will be necessary for me to forthwith thereafter to buy the said 4200 poults upon the market; and in that event will hold you for the loss from increased price, and damages for failure to deliver at the time agreed.

"The money for the poults which you delivered on the 11th inst. to me, Geo. N. Day and Lee C. Mower is in my hands awaiting your performance or breach of the contract."

Shortly after their delivery, it appears that plaintiff disposed of the 768 poults because of the fact that he could not employ a man to brood such a small number. There is evidence that during May and June plaintiff negotiated to purchase other turkeys—"road runners". It appears that he closed the deal for such turkeys on the date he wrote the quoted letter.

Under such state of facts was there evidence sufficient to submit to the jury the question of defendant's liability for damages to the plaintiff?

The assignment noted hereinabove relating to the reception of incompetent evidence is related to that attacking the sufficiency of the evidence. We shall therefore first consider it. Respondent testified that when the orders were signed Black told him that the orders were "booked." He further testified, after detailing his experience as a seller of turkey poults and a grower of turkeys, that in that business the word "booked" means, when used in respect to an order, that the order is accepted. We need not dwell on this assignment for the reason that with respect to the contract or contracts under consideration the question is not whether the order was accepted but whether it was accepted unconditionally—both as to the number of poults to be delivered and as to the time of delivery. It appears clearly from the order itself, in connection with the testimony of the plaintiff that an order was booked when the date of delivery was entered thereon be-

cause it is provided therein that "right is reserved to make delivery of this order within five days of the date booked." This, of course, could not be construed to mean that delivery would be made within five days of the date the order was placed but rather within five days of the date delivery was indicated on the order. This is further indicated by letters to other customers of the defendant introduced in evidence by the plaintiff. We quote but one of them. Others are of similar import. That letter addressed to a witness for the plaintiff states:

"We have your deposit of $225 as a 20% deposit on poults that are booked for delivery some time near the middle of April. We will give you a definite booking a little later and will place your order when it is convenient to deliver with other deliveries coming to your section."

Plaintiff was likewise permitted to testify as to the meaning of the word "hazard" in the turkey raising industry. In response to a question relative thereto he stated

"When they put on an order blank 'hazard' it means hazard in the turkey business, lightning, flood, train wrecks, things beyond human control. When it comes to operations of the turkey business, of course there is hazard from start to finish, but not in the terms of what we mean on an order blank as hazards."

The first part of this statement is a fair definition of what the word "hazards" as used in its context in the order blank means. What the second part means is not clear. It would seem to mean that all the hazards from start to finish in the turkey business are not included in the meaning of the word. In the first part of his statement he uses the words "When they put on an order blank 'hazard' "—then follows his definition there given. Such definition of the word in the turkey business would then include those fortuitous events which a raiser of poults could not by the exercise of foresight, skill, efficiency and diligence prevent but would not include those which would depend upon the human element. Consequently, the admission of the testimony re-

ferred to could not, in our opinion, have prejudiced the defendant.

Such being the case, it seems clear that the following factors and situations were hazards beyond the control of the defendant: (1) Lack of sufficient blood-tested stock during 1943 to produce the necessary quantity of eggs; (2) infertility of an unpredictable portion of ■ the eggs actually produced; (3) unfavorable weather conditions which retarded egg production; (4) blackouts along the Pacific coast which prohibited the use of artificial lights at the time when needed to speed up egg production.

As to this last factor, plaintiff states that the blackouts occurred during the year 1942 and consequently defendant knew about them; but this is immaterial. The problem is whether she contracted to deliver despite such conditions. It is patent that under the condition placed in the order blank, she did not.

It is then clear from the terms of the order and any acceptance thereof, that under its terms (giving the words "booked" and "hazard" the meaning ascribed to them by the plaintiff) the conditions hereinabove noted would excuse full performance and delayed performance. ■ If, then, under the evidence the jury could come to no other conclusion than that the failure of the defendant to perform fully and in time was due to "hazards beyond her control," and further that she performed insofar as those conditions would permit, then she has done all the law requires. As stated in 2 Williston on Sales, 2d Ed., Sec. 661, page 1657:

"It sometimes happens that because of excusable impossibility or other legal defense a contractor is unable to fulfill all of a number of similar obligations and yet could fulfill any one of these obligations if he totally disregarded the others. In such a case the contractor may apportion the possible performance pro rata among the several contracts, and be excused from further liability. But if the deficiency was due to new contracts not contemplated when the prior contracts were made, the contractor is not excused from liability under the earlier contracts."

Such pro rata performance the plaintiff had opportunity to accept, but he elected not to do so.

As to the issue of whether failure to fully and promptly perform upon the part of the defendant was due to hazards beyond her control; we are of the opinion, and so hold, that the evidence justifies but one finding, viz., that it was. From the outset of negotiation between the parties through the months that intervened, the hazards mentioned were referred to by defendants as the reason for delayed performance. Her testimony supports such explanations, and there is nothing in the record from which a jury could reasonably find or infer any other causes for the delay.

But it is contended by plaintiff that defendant contracted with and delivered to a Mr. Ford some 3400 poults subsequent to the date when plaintiff's contract should have been fulfilled. The evidence relative to such issue was the testimony of the purchaser, Mr. Ford, a witness for the plaintiff. The substance thereof is as follows: One Mr. Spalding, a neighbor of Ford, had an order with the Childers Hatchery for some 6000 poults. He contacted Mr. Ford telling him in effect that he, Mr. Spalding, was unable to handle the poults and asked Mr. Ford if he would not take over his order. Since Mr. Ford was having trouble getting poults he was glad to accept the offer. He hence called Mr. Black who said it would be all right for him to take over Spalding's order. This was in the early part of March. On the 16th of March Ford made a deposit of $700 on the turkeys. He stated he did not remember signing anything at that time. Subsequently, in the month of May the defendant delivered to him, upon his payment of the purchase price, something over 3400 poults. He stated that the reason advanced by the defendant through Mr. Black for not delivering the total of the Spalding order was that the hatchery couldn't get eggs to hatch and therefore couldn't get poults to deliver. The nature of the transaction between Ford and Spalding is indicated by the witness' answers to questions propounded to him, namely:

"Mr. Spalding told me I could take over. * * * The idea was Mr. Spalding wanted me to take these turkeys. * * * Mr. Spalding, he wanted me to take this order that he had from Childers Hatchery, and I told him I would. I told Mr. Spalding I would, and Mr. Black said it would be all right."

From the foregoing, it is evident that the arrangement Mr. Ford was making with both Mr. Spalding and the defendant was to take over the Spalding order. It is evident that it was not his intent at that time to place a new and independent order with the defendant, for his own testimony indicates that it was difficult at that time to purchase poults. Furthermore, his transaction with Black was with respect to stepping in the place of Mr. Spalding. From all that appears in the record, Mr. Spalding's order had a priority over that of plaintiff. No contention to the contrary is made. If such be conceded, it is difficult to see how this transaction violated the defendant's obligation to plaintiff. Had defendant refused to carry out this arrangement, Spalding, since he had not cancelled any agreement he had with Childers Hatchery, could have insisted upon going through with the same and have the poults delivered to Ford. We are of the opinion that the transaction thus recited violated no obligation which the defendant owed to the plaintiff.

Some contention is made in plaintiff's brief to the issue that the defendant could have purchased poults to fulfill the balance of the plaintiff's order. However, there is no substantial evidence to that effect. The only evidence in the record relative thereto is a conversation in which someone asked why the Childers Hatchery did not secure poults from a Mr. Nielsen. It doesn't appear in the record whether Mr. Nielsen had poults or if so whether they were of quality which would be accepted by the plaintiff. Furthermore, it is quite clear from the record that any contract entered into by the plaintiff and the defendant was with relation to poults hatched from eggs at the Childers Hatchery from blood-tested stock and that neither the plaintiff nor the defendant

contemplated purchase of poults elsewhere by the defendant in order to fill the plaintiff's order.

As indicated at the outset, the plaintiff alleged in his complaint that the 750 poults delivered to the plaintiff on June 11th were accepted under an express agreement that the defendant would forthwith deliver a balance of 4250 on or before July 2d, which the defendant failed ▬ to do. If by such allegation plaintiff purported to allege that some new enforcible undertaking was entered into on that date, the contention must be overruled. First, since the amount there involved is in excess of $500 the plea of the statute of frauds precludes its enforcement. Secondly, since the plaintiff by his letter of June 15, 1943, expressly repudiated such contract unless the defendant would undertake to put the agreement in writing, the latter would be acquitted of any obligation upon her part to perform. Furthermore, if at the date the letter was written, there existed an obligation to perform upon the part of the defendant by virtue of her conditional acceptance of plaintiff's order of November 10, 1942, the anticipatory breach evidenced by such letter would likewise preclude plaintiff from basing his action on any alleged breach thereafter of the undertaking entered into thereby.

From what has been said, it follows that the request for a directed verdict in favor of the defendant should have been given. The judgment is reversed and the cause is remanded to the district court with directions to set aside the verdict and to enter judgment in favor of the defendant and against the plaintiff in the sum of $65, the unpaid balance of the purchase price of poults actually delivered. Costs to appellant.

LARSON, C. J., and WADE and WOLFE, JJ., concur.

TURNER, Justice (concurring in the result).

I think the evidence shows conclusively that the plaintiff, Ray S. Tanner, gave the defendant an order for 9000 broad breasted turkey poults and that this order was regularly

accepted by the Childers Hatchery. However, by the provisions of the order, it was accepted subject to hazards beyond the control of the hatchery.

The record discloses that the hatchery was working under some difficulties. These were made known to Mr. Tanner and he, as others, willingly consented that delivery of the poults might be made later than requested in the original orders.

The plaintiff in April, 1943, accepted 4000 poults from the hatchery. About this time, Black explained the causes for delay to the plaintiff and stated that he could not definitely say when the balance of the order could be shipped. About June 1st, Black notified the plaintiff that the next shipment of poults to Utah would fall considerably short of filling all the remaining orders in this area. On June 11, 1943, 7300 turkey poults arrived by truck. These were not consigned to the purchasers but were accompanied by Black, who then told the plaintiff that no more poults would be available and asked plaintiff what he should do. As stated by Mr. Justice McDonough,

"In substance, the plaintiff directed Black to fill all orders of other customers first and then give him the balance. Black did as plaintiff directed. As a consequence, plaintiff received only 768 poults instead of 3500, which he would have received had he permitted the orders to be filled pro rata."

The plaintiff by his pleadings contends that he accepted 750 poults then under an express agreement that the defendent would forthwith deliver to him a balance of 4250 turkey poults on or before July 2, 1943. The plaintiff's own evidence discloses that this was not the case. Black, before delivery of these poults, advised the plaintiff that the delivery would be short and informed plaintiff of the hatchery's difficulties. Then, right at the time of delivery, Black told the plaintiff that there would be no more poults shipped to Utah. These facts are testified to by the plaintiff himself who, not satisfied with Black's statements, testified that he called Emma Childers on long distance and that she said there

would be two or three more hatchings and that if he wanted the poults she would deliver them to him by July 2d. For reasons best known to the plaintiff, he wrote the defendant the letter copied in Mr. Justice McDonough's opinion.

I heartily agree with Mr. Justice McDonough that if the plaintiff seeks to recover on a new contract made by telephone for 4250 poults to be delivered by July 2, 1943, he cannot for two reasons: First, such a contract does not comply with the statute of frauds; second, that if such a contract was made it was terminated by the plaintiff's letter of June 15, 1943.

By a great preponderance of evidence, it is well established that when the shipment of 7300 poults arrived the plaintiff waived delivery of the birds, which he would have received had he accepted pro rata delivery.

I concur with the legal definition of hazards of the turkey business as stated. Hazards of the turkey business would

"include those fortuitous events which a raiser of poults could not by the exercise of foresight, skill, efficiency and diligence prevent."

I do not agree with Mr. Justice McDonough as to what these are and that the record justifies but one finding, viz., that the

"failure to fully and promptly perform upon the part of the defendant was due to hazards beyond her control."

I am of the opinion that the defendant was relieved of further performance because of the plaintiff's letter wherein he, in substance, asked the defendant to confirm their agreement as to delivery by letter or wire as he would purchase turkeys elsewhere and hold her for damages.

However, had the plaintiff not have written the letter and no more poults had been delivered to him, he could, in my opinion, have recovered for damages for birds not waived and not delivered unless the defendant could have excused herself for breach of contract by reason of the provision of the contract as to hazards. In such case the court would

have had to instruct the jury as to what constituted "hazards" and submitted the factual matters to the jury.

For these reasons, and those of Mr. Justice McDonough's opinion in harmony with these, I concur.